ERIC KLEIN ET AL. *v.* NORWALK HOSPITAL
(AC 28646)

Flynn, C. J., and Robinson and West, Js.

Argued November 18, 2008—officially released April 21, 2009

*Brenden P. Leydon,* with whom, on the brief, was *Patrick J. Filan,* for the appellant (named plaintiff).

*Frank W. Murphy,* with whom was *Kara A. T. Murphy,* for the appellee (defendant).

*Opinion*

WEST, J. In this medical malpractice action, the plaintiff Eric Klein[1] appeals from the trial court's judgment,

---

[1] Jamie Klein, Eric Klein's wife, was also a plaintiff in this action but is not a party to this appeal. We therefore refer in this opinion to Eric Klein as the plaintiff.

rendered after a jury verdict, in favor of the defendant, Norwalk Hospital (hospital). The issues we must address arise out of the insertion of a needle in an effort to place an intravenous catheter into the arm of the plaintiff during his postoperative recovery from an emergency appendectomy. We must consider whether evidentiary rulings, made during the trial, impaired full jury consideration of the plaintiff's claims for recovery. The plaintiff claims that the court improperly denied his motion to set aside the verdict and for a new trial. Specifically, the plaintiff claims that the court improperly (1) precluded the testimony of his expert witness concerning causation because the witness was not disclosed properly pursuant to Practice Book § 13-4 (4)[2] and (2) admitted the testimony of the defendant's expert witness concerning causation. We affirm the judgment of the trial court.

The record reveals the following facts and procedural history pertinent to the plaintiff's appeal. On February 27, 2003, the plaintiff, a dentist, was admitted into the hospital because of a perforated appendix and infectious abscesses. Later that day, he underwent emergency surgery to remove his burst appendix as well as

---

[2] Practice Book (2006) § 13-4 (4) provides in relevant part: "[A]ny plaintiff expecting to call an expert witness at trial shall disclose the name of that expert, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, to all other parties within a reasonable time prior to trial. Each defendant shall disclose the names of his or her experts in like manner within a reasonable time from the date the plaintiff discloses experts, or, if the plaintiff fails to disclose experts, within a reasonable time prior to trial. If disclosure of the name of any expert expected to testify at trial is not made in accordance with this subdivision, or if an expert witness who is expected to testify is retained or specially employed after a reasonable time prior to trial, such expert shall not testify if, upon motion to preclude such testimony, the judicial authority determines that the late disclosure (A) will cause undue prejudice to the moving party; or (B) will cause undue interference with the orderly progress of trial in the case; or (C) involved bad faith delay of disclosure by the disclosing party. . . ."

a portion of his large intestine that had a cyst on it. The plaintiff recuperated during the immediate postoperative period as a patient in the hospital. Part of his postoperative treatment was intravenous antibiotic therapy to address the infection that resulted from his appendix bursting. On March 3, 2003, as part of her duties as a registered nurse employed by the hospital on its intravenous team,[3] Patricia DePaoli inspected the plaintiff's existing intravenous lines to determine if they required changing or other treatment. Morton Klein, the plaintiff's father, was in the room visiting his son when DePaoli entered. Upon inspection, DePaoli discovered, on the back of the plaintiff's left hand, around an existing intravenous site, an area of low grade phlebitis.[4] She began to replace the existing intravenous line in his left hand with a new intravenous line farther up his arm. During this procedure, Morton Klein testified, his son shouted out in pain on three occasions and that after the third incident, DePaoli terminated her attempt at inserting an intravenous line into the plaintiff's left arm. Morton Klein, however, did not see any of the procedure performed by DePaoli on his son's left arm.

The plaintiff testified that during the procedure to place a new intravenous line into his left arm, he felt a distinct and sharp pain shooting down his arm just after DePaoli inserted the needle. He exclaimed in pain but allowed DePaoli to keep going with the procedure. He felt another sharp pain and again exclaimed, telling DePaoli that she had hit a nerve. DePaoli continued

---

[3] At the hospital, the intravenous team is a group of registered nurses that is responsible for various duties involving the insertion and monitoring of assorted intravenous catheters for differing therapeutic purposes. Team members also are responsible for training other hospital personnel in these procedures.

[4] Phlebitis is "[i]nflammation of a vein." Stedman's Medical Dictionary (27th Ed. 2000) p. 1368. According to the testimony and documents properly in evidence, the phlebitis around this intravenous site on the plaintiff's arm was rated at "one plus" on a scale from one to five.

with the procedure until the plaintiff exclaimed in pain for a third time, complaining that his entire left hand had gone "dead" and telling DePaoli to remove the needle. After applying a dry sterile dressing to the area of the unsuccessful attempt, DePaoli then, without incident, inserted another intravenous line in the plaintiff's right arm.

After his release from the hospital, the plaintiff asserted that he was having ongoing difficulties using his left hand and saw many medical specialists, including neurologists and a hand surgeon. These lingering effects were diagnosed, according to the plaintiff, as anterior interosseous nerve palsy caused by an improper attempted intravenous line insertion and had a negative impact on his dental practice and overall quality of life. He brought this action against the hospital, alleging medical malpractice on its part for the alleged improper insertion of the intravenous line by its employee, DePaoli, which resulted in the diagnosis of anterior interosseous nerve palsy.

On January 11, 2006, the plaintiff, pursuant to Practice Book § 13-4 (4), disclosed Clifford Gevirtz, an anesthesiologist specializing in pain management, as an expert witness. According to the disclosure, Gevirtz was to testify on matters concerning the standard of care to which the defendant was held, departures from the standard of care, causation and damages. He was not specifically disclosed as an expert on Parsonage Turner Syndrome nor was it disclosed that he would be testifying about the disease. During his direct examination of Gevirtz, Patrick J. Filan, counsel for the plaintiff, asked him if he was "familiar with the condition known as Parsonage Turner Syndrome." The court sustained the defendant's objection on the ground that the plaintiff's disclosure did not encompass Gevirtz' testifying on the syndrome because the plaintiff was not "in compliance with the Practice Book requirement

with respect to disclosure in order to use this expert witness for [that] purpose." The court allowed Filan, outside of the jury's presence, to make a proffer as to what Gevirtz would have testified to in regard to Parsonage Turner Syndrome. The following examination then took place:

"Q. Doctor, are you familiar with the syndrome called Parsonage Turner Syndrome?

"A. Yes, sir.

"Q. And what is it?

"A. It is a neurologic syndrome comprising pain in— usually abrupt onset of pain in the shoulder. Weakness of the girdle, the muscle girdle of the upper extremity. The pain is very severe, usually described from a pain management point of view as eight over ten or greater. And it gradually decreases over time. You are left with muscle wasting.

"Q. And what role, if any, does an acute injury play in allowing one to make a conclusion that a given neurological condition is Parsonage Turner Syndrome?

"A. It has been—Parsonage Turner Syndrome, the etiology has been attributed to various traumas, to various surgical issues. In other words, it can happen postoperatively and things like that.

"Q. And in this case, what opinion do you have concerning whether or not this was due—the plaintiff's injury was due to Parsonage Turner Syndrome?

"A. It is not due to Parsonage Turner Syndrome.

"Q. What is the basis for that opinion?

"A. Because the injury is entirely compatible with a needle injuring the anterior interosseous nerve. . . .

* * *

"Q. Okay. . . . And have you studied Parsonage Turner Syndrome?

"A. Yes, sir.

"Q. Have you treated Parsonage Turner Syndrome?

"A. Yes, sir.

"Q. Have you published on Parsonage Turner Syndrome?

"A. Yes, sir.

"Q. Is this within your area of expertise?

"A. I believe so. Yes, sir."

Later in the trial, Frank W. Murphy, counsel for the defendant, called Robert Strauch, an orthopedic surgeon specializing in hand surgery, to testify as an expert witness on the requisite standard of care and causation. The court, upon Filan's objection, conducted a *Porter* hearing[5] to determine whether, and if so, what scientific methodology would allow the witness to diagnose, within a reasonable degree of medical certainty, without examination, the plaintiff's injury as being caused by Parsonage Turner Syndrome. After voir dire examination by both Murphy and Filan, the court allowed Strauch to testify that, on the basis of his review of the plaintiff's medical records and deposition testimony, the plaintiff's alleged injury was caused by Parsonage Turner Syndrome.

After closing arguments, the court instructed the jury and then submitted the case to it for deliberation, together with special interrogatories. The first interrogatory read: "Did the plaintiff, Eric Klein, prove by a preponderance of the evidence that [the] defendant,

[5] See *State* v. *Porter,* 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

Norwalk Hospital, in its care and treatment of Eric Klein breached the standard of care for registered nurses in any of the ways alleged in the complaint?" The jury answered this question in the negative and returned a verdict in favor of the defendant. The plaintiff filed a motion to set aside the verdict and for a new trial. The court denied the motion. This appeal followed.

Preliminarily, we set forth the applicable standard of review. "It is well settled that we will set aside an evidentiary ruling only when there has been a·clear abuse of discretion. . . . [B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Citation omitted; internal quotation marks omitted.) *Kalams* v. *Giacchetto*, 268 Conn. 244, 249–50, 842 A.2d 1100 (2004); see also *State* v. *Tatum*, 219 Conn. 721, 738, 595 A.2d 322 (1991) (burden is on party claiming nonconstitutional evidentiary error to show that "it is more probable than not that the erroneous action of the court affected the result"). "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, expert testimony is required to establish both the standard of care to which the defendant is held and the breach of that standard." (Internal quotation marks omitted.) *Gold* v. *Greenwich Hospital Assn.*, 262 Conn. 248, 254–55, 811 A.2d 1266 (2002).

Our Supreme Court's ruling in *Kalams* is especially instructive in the plaintiff's appeal. In *Kalams*, in the context of a medical malpractice action, an evidentiary ruling was assailed on appeal. As the court summarized: "During the trial, the defendant filed a motion in limine seeking to preclude [the plaintiff's expert witness] from testifying on the issue of causation. The trial court . . . heard arguments on the motion. Counsel for the plaintiff argued that the motion should be denied because the [plaintiff's] disclosure [of the expert] had been sufficient to put the defendant on notice that [the witness] would be testifying on the entire liability aspect of the case, including causation. The court . . . granted the motion in limine. [The plaintiff's expert witness] testified that he treated the plaintiff after the defendant had performed the two shoulder surgeries on him [that were at issue in the case]. When the plaintiff first came to [the witness'] office, he was unable to move his right arm. [The witness] performed exploratory surgery on the plaintiff's shoulder and determined that his deltoid muscle had detached from the bone as a complication of the surgeries performed by the defendant. [The witness] testified that the defendant had deviated from the standard of care by failing to diagnose the detachment of the muscle and by failing to treat that condition. The plaintiff attempted to question [the witness] on whether the defendant's alleged deviation from the standard of care had caused the plaintiff's injuries. The trial court sustained the defendant's objections to the questions. . . .

"After the conclusion of evidence and the instructions to the jury, the trial court provided the jury with a verdict form containing two interrogatories. The first interrogatory asked: 'In the medical malpractice claim, did [the] plaintiff prove by a preponderance of the evidence that [the defendant] was negligent in failing to comply with the standard of care applicable to him?'

The second interrogatory asked: 'In the medical malpractice claim, did [the] plaintiff prove by a preponderance of the evidence that [the defendant's] negligence was a proximate cause of [the plaintiff's] damages?' The jury answered 'no' to both interrogatories. Accordingly, the jury returned a verdict for the defendant in the medical malpractice action." *Kalams* v. *Giacchetto*, supra, 268 Conn. 247–49.

The court concluded that it need not "consider the merits of the trial court's ruling on the motion in limine because, even if [it assumed] that the ruling was improper, it was harmless. The jury was not required to reach the issue of causation because, as evidenced by its answers to the jury interrogatories, it first determined that the defendant had not breached the standard of care." Id., 250. We conclude that the analysis provided in *Kalams* applies here. The jury found no breach of the standard of care by the hospital and, therefore, did not need to address the causation prong. Simply put, because the jury found no breach of the standard of care, any harm claimed as to an evidentiary ruling regarding causation is nugatory because there is no negligence. "Accordingly . . . it is not reasonably probable that testimony on causation would have affected the result." Id.

Here, the plaintiff essentially argues, however, that the preclusion of the portion of Gevirtz' testimony on causation concerning Parsonage Turner Syndrome, in combination with the admission of Strauch's testimony concerning the same issue, were harmful because causation of the injury *itself* established the breach of the requisite standard of care. Therefore, the plaintiff contends, it *is* reasonably probable that the testimony on causation would have affected the result: i.e., that the jury found no breach of the standard of care. After a thorough review of the record, we do not agree. Nowhere in the record is there any indication that the

evidentiary rulings challenged by the plaintiff related to the issue of whether the hospital had breached the standard of care or that the plaintiff presented this evidence to the court or the jury as pertaining to that issue.[6] See *State* v. *Scruggs*, 279 Conn. 698, 718, 905 A.2d 24 (2006) ("for any appellate theory to withstand scrutiny . . . it must be shown to be not merely before the jury due to an incidental reference, but as part of a coherent theory . . . that, upon [review of] the principal stages of trial, can be characterized as having been presented in a focused or otherwise cognizable sense" [internal quotation marks omitted]). Therefore, we cannot say that under the circumstances, these rulings would have affected the result of the jury's finding on the dispositive issue of a breach of the standard of care.

The plaintiff further claims that in allowing Strauch to testify about Parsonage Turner Syndrome and not Gevirtz, the court "completely destroyed [Gevirtz'] reliability to the jury in explaining his opinions on the central contested issue in the case." Again, we disagree. A similar argument was put forth by the plaintiff in *Kalams*, in which the plaintiff's expert witness testified

---

[6] For example, in his colloquy with the court concerning the testimony of Gevirtz on Parsonage Turner Syndrome, the plaintiff repeatedly referred to the proffered testimony as relating to causation and not once to the breach of the standard of care. The plaintiff also argued repeatedly that Gevirtz should be allowed to testify on Parsonage Turner Syndrome because he was properly disclosed on causation and therefore should be allowed to testify as to what did *not* cause the plaintiff's injury.

Furthermore, the plaintiff agreed with the court's characterization of the purpose of the *Porter* hearing, which was to ascertain if the defendant's expert "[could] testify to a reasonable degree of medical certainty that at least one potential cause of those symptoms [was] in fact that cause."

Moreover, the plaintiff argued consistently to the jury in his closing argument that the incidents of the procedure itself—the failure of DePaoli to locate a vein, the location of the needle insertion, the depth and angle of the insertion, the repeated attempts by DePaoli in light of both the plaintiff's exclamations of pain and the lack of a blood flashback (the talismanic sign of an actual insertion of the needle into the vein)—were all indications of the defendant's breach of the requisite standard of care.

as to breach of the standard of care but was precluded from testifying about causation. The plaintiff argued on appeal that "the exclusion of [the expert's] testimony on causation was harmful because [the expert] was the plaintiff's only expert witness and his failure to testify on an essential element of the medical malpractice claim was bound to have undermined his credibility in the eyes of the jurors." *Kalams* v. *Giacchetto*, supra, 268 Conn. 250. Here, Gevirtz was allowed to testify extensively about causation; he was only precluded from testifying on the narrow point that Parsonage Turner Syndrome *did not* cause the plaintiff's alleged injuries. As the court in *Kalams* stated, "we will not assume that the jury engaged in improper speculation as to the reason that the questions were not permitted." Id., 251. As a result, we conclude that it is unlikely that the jurors discounted otherwise credible testimony by Gevirtz as to the alleged deviation from the standard of care or causation, for that matter, merely because he did not provide an opinion on an issue about which he did not testify. Accordingly, we cannot conclude that the precluded evidence would have had an effect on the final result; therefore, its preclusion was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.